# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VERNA AGGIE, et al.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 15-5456** |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **HUMAN SERVICES, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                                          **December 7, 2015**

## MEMORANDUM OPINION

This case involves an ongoing dispute between an Upper Darby day care facility and the Pennsylvania Department of Human Services ("DHS"), which has refused to renew the facility's operational license. After extensive litigation in Pennsylvania state court, Plaintiff, Verna Aggie (d/b/a The Preschool Academy, Inc. ("TPA")), instituted this federal action against Defendants, DHS, Pennsylvania Department of Human Services Office of Child Development and Early Learning ("OCDL"), Ted Dallas, Gwenn Brown, Barbara Minzenberg, Asia Sheppard, and Terry Shaner Wade.[1] Plaintiff alleges that Defendants unlawfully refused to renew her certificate of compliance to operate a commercial day care facility.  Plaintiff further claims that the standard of review imposed by the Commonwealth Court of Pennsylvania created a discriminatory "test" whereby urban, African American day care operators are held strictly liable for certain infractions under the state regulations governing childcare facilities, whereas rural, Caucasian operators are held liable under traditional principles of negligence.

---

[1] Ted Dallas is Secretary of DHS. Gwenn Brown is a DHS Inspector. Barbara Minzenberg is Deputy Secretary of OCDL. Asia Sheppard and Terry Shaner Wade are Directors of OCDL.

Plaintiff has brought claims for race and sex discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., (Counts II, III, VI, VII, VIII), Intentional Infliction of Emotional Distress (Count IX), due process and equal protection violations under the First, Fifth, and Fourteenth Amendments to the United States Constitution (Count X), Conspiracy (Count XI), three claims pursuant to 42 U.S.C. § 1983 for alleged violations of Plaintiff's federal rights (Counts I, IV, V), and injunctive and declaratory relief (Count XIII).[2]

Presently before me is (1) Plaintiff's motion for a temporary restraining order ("TRO") to enjoin Defendants from shutting down her day care facility, and (2) Defendants' motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. For the reasons that follow, I will deny Plaintiff's TRO motion, and grant Defendants' motion to dismiss.

## I.      FACTUAL AND PROCEDURAL HISTORY

Unless otherwise indicated, the following facts are taken from Plaintiff's complaint and attached exhibits.

Plaintiff obtained her license to perform child day care services in 1998, and operated "Aggie's Child Care and Preschool" until 2012. In February 2012, Plaintiff moved her business to its current location in Upper Darby, Pennsylvania, and renamed it "The Preschool Academy."[3] Plaintiff continues to be the owner and proprietor of TPA. (Compl. ¶ 22.) Because TPA was a new commercial facility, DHS required Plaintiff to obtain a new certificate of compliance, which must be renewed annually. See Public Welfare Code, 62 P.S. § 1009. (A certificate of compliance is essentially a business license). The events giving rise to this litigation began approximately eight months after Plaintiff opened TPA.

---

[2] Plaintiff did not include a Count XII in her complaint.

[3] TPA has seventeen (17) classrooms, twenty-six (26) employees, and eighty-five (85) students. (Compl. ¶ 22.)

On October 2, 2012, a TPA teacher left a child unsupervised. The child wandered off TPA's premises and was not discovered missing until his parent came to pick him up later that day. The child was found unharmed near the facility that same afternoon. Plaintiff fired the teacher responsible for failing to properly supervise the child. (Compl. ¶ 27.)

When DHS learned of this incident, it conducted three unannounced inspections. On December 19, 2012, January 28, 2013, and February 25, 2013, a DHS inspector allegedly observed, among other things, unsupervised children in violation of 55 Pa. Code § 3270.113(a), staff-to-child ratios that did not comport with Pennsylvania regulation § 3270.52, an incident wherein one child was allegedly bitten by another child, and certain sub-standard hygiene conditions in violation of § 3270.134(a). (Compl. ¶¶ 31–34; Pl.'s Ex. D–1.)

On April 19, 2013, Plaintiff received a letter from DHS informing her that it was refusing to renew her certificate of compliance for failure to comply with DHS regulations, and gross incompetence, negligence, or misconduct in operating TPA. (See Pls.' Ex. D-5; Public Welfare Code, 62 P.S. § 1026(b)(1), (4)). As it is unlawful to operate a commercial day care center without a current certificate of compliance, DHS instructed Plaintiff to cease and desist all operation of TPA, in effect forcing her to close her business. (Compl. ¶¶ 9, 20, 36.)

Plaintiff appealed DHS's refusal to renew and appeared before an Administrative Law Judge (ALJ) on August 27, 2013. Acting pro se, Plaintiff offered her own testimony but provided no other evidence. She testified that she had submitted a plan for corrective action to DHS, and thus should be given a second chance because all of the alleged violations had been remedied. Defendant Brown—the DHS Inspector who oversaw the three unannounced inspections—also submitted evidence based on her observations at TPA. The ALJ ultimately issued a proposed adjudication denying Plaintiff's appeal. While the ALJ found that Plaintiff had only violated five

of the alleged ten infractions documented by DHS, it concluded that these findings were sufficient to support DHS's decision not to renew Plaintiff's certificate. (Compl. ¶¶ 27, 38, 41.)

On February 24, 2014, the Chief ALJ of the Bureau of Appeals adopted the ALJ's recommended adjudication in its entirety. (See Pl.'s Ex. D-1.) Plaintiff then sought relief in the Commonwealth Court of Pennsylvania, arguing that DHS based its decision on findings that were not supported by substantial evidence, largely due to Defendant Brown allegedly making misrepresentations to the ALJ. Plaintiff also alleged that DHS violated her substantive and procedural due process rights in violation of Article I, Section I of the Pennsylvania Constitution and the Fourteenth Amendment of the U.S. Constitution. The Commonwealth Court issued a stay regarding the closure of TPA while the litigation was pending. Plaintiff therefore continued to operate TPA throughout the appeals process. (See Pl.'s Ex. A-1.)

On December 30, 2014, the Commonwealth Court affirmed the order of the Chief ALJ. See Aggie v. Dep't of Pub. Welfare, WL 10298851 (Pa. Commw. Ct. Dec. 30, 2014), reconsideration and reh'g denied (Feb. 11, 2015), appeal denied sub nom. Aggie v. Com., Dep't of Pub. Welfare, Office of Child Dev. & Early Educ., 118 A.3d 1109 (Pa. 2015). The Commonwealth Court concluded that the ALJ's adjudication of Plaintiff's appeal was supported by substantial evidence, was free from errors of law, and did not violate Plaintiff's constitutional rights.[4] Id. at 10.

As much of Plaintiff's federal lawsuit centers around the Commonwealth Court's opinion, further exploration of that case is necessary.

A large portion of the Commonwealth Court's analysis focused on distinguishing Plaintiff's case from a similar case, Gibbs v. Dep't of Pub. Welfare, 947 A.2d 233 (Pa. Commw.

---

[4] The Commonwealth Court denied Plaintiff's due process claims under the Pennsylvania Constitution. It therefore did not reach the merits of her due process argument under the Fourteenth Amendment of the U.S. Constitution.

Ct. Apr. 10, 2008). In <u>Gibbs</u>, the Commonwealth Court reversed the decision of DHS, which revoked a child day care owner's registration certificate to operate a "family child day care home." The <u>Gibbs</u> plaintiff left approximately four to six children under the supervision of her son, an employee of the day care. The plaintiff's son allowed one of the children to wander off the plaintiff's property and into a neighbor's yard, which was across a dead-end road. The child was found unharmed approximately three minutes later. The Commonwealth Court held that the plaintiff could not be liable for failing to supervise the child because she had entrusted the child to the supervision of her son, an adult employee of the day care. Therefore, the court found that the plaintiff had not violated the DHS regulation applicable to on-premise supervision of children. <u>Id.</u> at 237.

In the instant case, the Commonwealth Court acknowledged that there is conflicting guidance as to when a day care operator may be held liable for the actions of another. <u>See</u> <u>e.g.</u>, <u>Altagracia De Pena Family Day Care v. Dep't of Pub. Welfare</u>, 943 A.2d 353, 355 (Pa. Commw. Ct. Dec. 21, 2007) (concluding a day care operator's registration certificate was properly revoked where she entrusted the children in her day care to the supervision of her two sons, neither of whom were employees, and a two-year-old child subsequently left the plaintiff's home and wandered into the street). The Commonwealth Court emphasized that each case requires a fact-intensive inquiry, and it must not be "overly rigid in [its] interpretation of statutory and common law." <u>Aggie</u>, 2014 WL 10298851, at *6. The court further stated that DHS was not required to prove that Plaintiff knowingly participated in or acquiesced to the violations DHS levied against her because such a rule would provide owners of commercial facilities with a "blanket defense and [would] discourage the close monitoring of the activities at such facilities." <u>Id.</u> at 6.

Additionally, the court underscored the fact that the child from Plaintiff's facility was not discovered missing until his parent came to pick him up, and was missing for a much longer period of time than the child in <u>Gibbs</u>. <u>Id.</u> at 6. The court reasoned that "[a]llowing a child to wander off in the urban high-crime area where TPA is located is totally distinguishable from <u>Gibbs</u> where the child merely crossed a dead-end, rural road into a neighbor's yard." <u>Id.</u> at 6. As noted above, this portion of the Commonwealth Court's opinion forms the basis for much of Plaintiff's federal complaint.

On January 12, 2015, Plaintiff filed an application for reconsideration or rehearing with the Commonwealth Court, which was denied on February 11, 2015. On March 16, 2015, Plaintiff filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court, which was denied on July 21, 2015. DHS then mailed a letter to Plaintiff indicating that its decision regarding the refusal to renew her certificate of compliance was final, and therefore, she must cease and desist all operation of TPA by September 15, 2015. (See Pl.'s Ex. A-1.) Plaintiff nonetheless continued to operate TPA beyond the September 15 deadline.

On October 2, 2015, Plaintiff filed her federal complaint, along with a motion for an ex-parte temporary restraining order requesting that Defendants be enjoined from shutting down TPA while this litigation is pending. Plaintiff renews many of her allegations regarding DHS's refusal to renew her certificate of compliance. She also challenges the Pennsylvania Commonwealth Court's decision throughout her federal complaint, and essentially argues that the alleged "urban high-crime area" standard articulated by the Commonwealth Court subjects her to an unlawful and discriminatory standard of review in violation of both equal protection and due process. (See Compl. ¶¶ 66–70, 72–74, 77, 80, 82–90.)

During a teleconference on October 7, 2015, the parties agreed that a TRO was appropriate such that Plaintiff could continue to operate TPA pending a resolution of this litigation. I therefore issued an Order on October 7, 2015 granting in part Plaintiff's motion for a TRO, which was renewed on October 21, 2015, November 4, 2015, November 18, 2015, and again on December 2, 2015 pursuant to Federal Rule of Civil Procedure 65(b)(2).[5]

In addition to their response in opposition to Plaintiff's TRO motion, Defendants have filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. Defendants argue this Court lacks jurisdiction under the "Rooker-Feldman" doctrine because Plaintiff is essentially asking me to serve in an appellate capacity in reviewing the Commonwealth Court's opinion—a role reserved for the Supreme Court of the United States.

## II.    LEGAL STANDARD – <u>ROOKER FELDMAN</u> DOCTRINE

Defendants have filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the Rooker-Feldman doctrine bars this Court from hearing Plaintiff's claims. Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983); (Defs.' Mot. to Dismiss 1.)

Whether a district court possesses subject matter jurisdiction is an antecedent question that must precede any merits determination. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007). Therefore, before I evaluate Plaintiff's TRO motion, I must first determine whether or not I have jurisdiction to consider Plaintiff's claims.

A 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be treated as either a "facial" or "factual" attack on a court's jurisdiction. Gould Electronics Inc. v. United

---

[5] Temporary Restraining Orders automatically expire after fourteen (14) days from the date of their entry. Fed. R. Civ. P. 65(b)(2). A district court may extend a TRO for an additional fourteen (14) days for "good cause," so long as it notes its reasons on the record. See Globus Med., Inc. v. Vortex Spine, LLC, 605 F. App'x 126, 129 (3d Cir. 2015). Given the extensive procedural history of this case, and the fact that Plaintiff raised thirteen (13) claims against Defendants, I concluded "good cause" existed to extend the TRO because I needed additional time to consider the parties' positions.

States, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a facial attack, a court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Id. at 176; see also Fed. R. Civ. P. 10(c) (a copy of a written instrument that is attached to a pleading as an exhibit is part of the pleading for all purposes). A court accepts as true the allegations of the complaint under a facial attack. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

In a factual challenge, on the other hand, a court is "free to weigh evidence beyond the plaintiff's allegations." Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997). In a factual attack, a court must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings. Transp. Compliance Associates Inc. v. Hammond, WL 604426, at *2 (W.D. Pa. Feb. 24, 2012).

Here, Defendants do not challenge jurisdiction based on the factual assertions contained in Plaintiff's complaint. Rather, they contend that jurisdiction is lacking strictly as a matter of law based on the Rooker-Feldman doctrine. Therefore, while Defendants do not expressly state which type of attack they are advancing, I will construe their 12(b)(1) motion as a facial attack because they present a legal argument against jurisdiction as opposed to a factual one. See Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) ("A factual attack requires a factual dispute, and there is none here.").

A facial attack under 12(b)(1) offers similar protections to a plaintiff as does a 12(b)(6) motion: a court must consider the allegations of the complaint as true and view the facts in the light most favorable to her. Mortenson, 549 F.2d at 891; see also Constitution Party of Pennsylvania, 757 F.3d at 358 (acknowledging that a facial attack under Rule 12(b)(1) calls for a

district court to apply the same standard of review as it would in considering a Rule 12(b)(6) motion to dismiss).

### III.     ANALYSIS – ROOKER FELDMAN DOCTRINE

Jurisdiction to review a state court's decision rests solely with the United States Supreme Court. 28 U.S.C. § 1257(a). Federal district courts lack subject matter jurisdiction over challenges that are the "functional equivalent" of an appeal of a state court judgment.[6] Marran v. Marran, 376 F.3d 143, 149 (3d Cir. 2004). The Rooker–Feldman doctrine thus stands for the proposition that "a party's recourse for an adverse decision in state court is an appeal to the appropriate state appellate court, and ultimately to the Supreme Court under § 1257, not a separate action in federal court." Parkview Associates P'ship v. City of Lebanon, 225 F.3d 321, 324 (3d Cir. 2000).

The United States Supreme Court has held the Rooker-Feldman doctrine must be narrowly confined to "those cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). The United States Court of Appeals for the Third Circuit has broken down this holding into a four-part test to determine whether the Rooker-Feldman doctrine applies: (1) the federal plaintiff must have lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the

---

[6] "Although § 1257 refers to orders and decrees of the highest state court, the Rooker–Feldman doctrine has [also] been applied to final decisions of lower state courts." In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005).

state judgment. <u>Great W. Mining & Mineral Co. v. Fox Rothschild LLP</u>, 615 F.3d 159, 166 (3d Cir. 2010).[7] Application of this four-part test to Plaintiff's claims reflects the following:

### A. Plaintiff Lost in State Court

The decision of the Chief ALJ, which upheld DHS's non-renewal of Plaintiff's certificate of compliance, was affirmed by the Commonwealth Court of Pennsylvania, and the Pennsylvania Supreme Court denied Plaintiff's petition for an appeal. This does not, however, end the analysis of the first factor under <u>Great W. Mining & Mineral Co.</u>

While the <u>Rooker</u>-<u>Feldman</u> doctrine does not apply to decisions rendered by administrative agencies, <u>see</u> <u>Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland</u>, 535 U.S. 635, 644 n. 3 (2002), there appears to be conflicting guidance within this circuit regarding whether a state court's affirmance of an administrative agency's decision constitutes "losing in state court."[8] Nonetheless, where, as is the case here, the source of the alleged injury is the state court's decision itself, and not merely the state court's affirmance of the administrative agency, the doctrine will apply. <u>See</u> <u>Cycle Chem, Inc.</u>, 465 F. App'x at 109.

---

[7] Prior to the Supreme Court's decision in <u>Exxon</u> <u>Mobil</u>, federal courts frequently employed the "inextricably intertwined" language set forth in <u>Feldman</u> to bar additional claims raised by federal plaintiffs. However, the Third Circuit has cautioned that, in light of the Supreme Court's <u>Exxon</u> <u>Mobil</u> decision, the phrase "inextricably intertwined"

> does not create an additional legal test or expand the scope of <u>Rooker</u>-<u>Feldman</u> beyond challenges to state-court judgments. When a federal plaintiff brings a claim, whether or not raised in state court, that asserts injury caused by a state-court judgment and seeks reversal of that judgment, the federal claim is "inextricably intertwined" with the state judgment [and therefore barred from review] … [It] has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in <u>Exxon</u> <u>Mobil</u>.

<u>Great W. Mining & Mineral Co.</u>, 615 F.3d at 170.

[8] <u>See</u> <u>Cycle Chem, Inc. v. Jackson</u>, 465 F. App'x 104, 109 (3d Cir. 2012) (concluding that because the State Appellate Division's decision merely affirmed the penalties imposed by an ALJ, and thus was not the source of the claimed injury, the <u>Rooker</u>-<u>Feldman</u> doctrine did not apply); <u>but see</u> <u>Abulkhair v. Dir. of New Jersey Dep't of Human Servs.</u>, 474 F. App'x 82, 84 (3d Cir. 2012) (concluding the <u>Rooker</u>-<u>Feldman</u> doctrine applied because an aggrieved federal plaintiff who attempts to seek relief from state administrative and court proceedings must appeal within the state court system, and ultimately to the United States Supreme Court).

Here, as detailed infra, Plaintiff's complaint continually points to the Commonwealth Court's opinion as the basis for her injuries and asserts that the state court ruling itself is unconstitutional based on an alleged discriminatory classification. (See Compl. ¶¶ 72, 74, 82–85, 88–90.) Thus, Plaintiff's alleged injury exists independently from the administrative agency's decision not to renew her certificate. Because the Commonwealth Court's opinion constitutes a loss in state court, the first Great W. Mining & Mineral Co. element is satisfied.

B.  Plaintiff Complains of Injuries Caused by the State-Court Judgment

The second requirement—that the injuries complained of were caused by a state-court judgment—is critical, and may be thought of as an inquiry into the source of a plaintiff's injury. Great W. Mining & Mineral Co., 615 F.3d at 166. A "useful guidepost" for determining the source of the alleged injury is the timing of the injury—that is, "whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." Id. at 167.

Many of Plaintiff's allegations attack the Commonwealth Court's decision, and the court's interpretation of Pennsylvania case law.[9] She alleges that she—an African American female operating an urban day care facility in a "high crime" area—was held to a different standard of review than similarly situated individuals in other cases involving the non-renewal of a certificate of compliance. (See Compl. ¶¶ 72, 74, 82–85, 88–90.) Specifically, Plaintiff's complaint raises the following allegations:

> The classification [imposed by the Commonwealth Court] is based on racial demographics and targets minorities, violating equal protection under the Fourteenth Amendment to the United States

---

[9] Plaintiff does not challenge the constitutionality of the regulations relied upon by DHS in its refusal to renew her certificate of compliance. A direct challenge to the constitutionality of a local or state rule presents a different avenue of analysis. See Ivy Club v. Edwards, 943 F.2d 270, 293 (3d Cir. 1991) ("[T]o the extent federal plaintiffs seek generally to challenge the federal constitutionality of a local or state statute or judicially promulgated rule, Feldman held a district court does have jurisdiction to hear plaintiffs' claims.") (emphasis in original).

Constitution. The justification for upholding the revocation was based on this unconstitutional classification. The determination relied only on pretext [and] stereotype to classify the urban predominantly African American area as high crime and the rural predominantly Caucasian area as safe…. There is no rational basis to support the conclusion that it is more dangerous in urban than in rural areas.… [The] Commonwealth Court of Pennsylvania misinterpreted, inconsistently, and unequally applied the law. (Compl. ¶¶ 72, 82–85, 88.)

The December 30th, 2014 decision of the Commonwealth Court of Pennsylvania created two classes of daycare operators based on racial makeup of the location in which they operate a facility. This is unconstitutional and a violation of equal protection. (Compl. ¶ 74.)

The application of the "test" … allows for the unequal application of the law. This "test" developed by the Commonwealth Court creates different standards, is racially discriminatory, and violates Equal Protection under the 14th Amendment to the United States Constitution and Title [VI] of the Civil Rights Act of 1964. The "test" applies vicarious strict liability to operators of urban facilities for any infraction of the [DHS] code, while holding rural operators to a different standard that requires [DHS] to demonstrate actual negligence by the operator. Nothing in the [DHS] code allows for strict liability. In this case strict liability unconstitutionally takes the Plaintiff's right to operate her business because of the actions of a third party employee without the need for [DHS] to show any negligence on behalf of Plaintiff. (Compl. ¶¶ 89, 90.)

Plaintiff expands upon these allegations in her briefs and response in opposition to

Defendants' motion to dismiss. Specifically, she argues:

The similarities between the Plaintiff's circumstances and those in the prior cases of Gibbs v. Dept. of Pub. Welfare, 947 A.2d 233 (2008) and Altragracia De Pena Fam. Day Care v. Dept. of Pub. Welfare, 943 A.2d 353 (2007) are multitudinous. The only pertinent question presented is why [Plaintiff is] being held to a different standard. The issue between Plaintiff and Gibbs and Altragracia is a constitutional question not a factual one. The determination that one class of owner[s] is vicariously strictly liable and others are held to a prudent person standard is unconstitutional. This violates the Equal Protection Clause under the United States Constitution and [f]ederal law…. [Plaintiff] is

being held to a different standard of care based solely on the racial makeup of the urban area [in which TPA is located]. (Pl.'s Br. 21, 24, Doc. No. 6.)

Holding Plaintiff to vicarious absolute responsibility for the actions of an employee violates due process in taking her property and tarnishing her reputation. Stare decisis calls for following prior precedent, which was clearly violated in this case. Equal protection requires treating similarly situated individuals the same, and Plaintiff has been held to a different standard than [the plaintiffs in Gibbs and Altragracia], which required [DHS to demonstrate] negligence…. The Commonwealth Court's interpretation of the law discriminates against minorities and creates two separate classes of daycare centers based on physical location. This interpretation is a violation of the Fifth and Fourteen Amendments of the United States Constitution and a violation of federal law under Title VI of the Civil Rights Act of 1964. (Pl.'s Br. 5, 15, Doc. No. 2-1.)

[The Commonwealth Court's] holding is arbitrary and irrational…. [It] is racially discriminatory on its face. Childcare centers in urban areas are population with African American children and are run by African Americans, such as Plaintiff. Childcare operators in rural areas are generally populated with Caucasian children, and are primarily run by Caucasian operators. There is no rational basis to support the conclusion that it is more dangerous in urban than in rural areas for an unsupervised child. This clearly violates equal protection under strict scrutiny and even under a rational basis [review]. (Pl.'s Br. 25, Doc. No. 6.)

With respect to the second requirement, that a plaintiff complain of an injury caused by a state-court judgment, the Third Circuit has stated that the "critical task is to … identify those federal suits that profess to complain of an injury [caused] by a third party, but actually complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.'" Great W. Mining & Mineral Co., 615 F.3d at 167 (quoting Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 88 (2d Cir. 2005)). The allegations in Plaintiff's complaint, as well as her arguments that attempt to defeat Defendants' motion, make clear that the substance of the allegations in this case target the decision of the Commonwealth Court itself.

The Second Circuit Court of Appeals has provided a helpful example for determining when the second <u>Great W. Mining & Mineral Co.</u> element is satisfied:

> Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments.

<u>Hoblock</u>, 422 F.3d at 87. This example is instructive in examining the allegations before me.

It is true that Plaintiff complained of DHS's conduct while appealing the non-renewal of her certificate in the state court system, and that she articulates many of these allegations in her federal complaint. However, the focus of Plaintiff's purported injury in this case stems from the Pennsylvania Commonwealth Court's decision itself. Put another way, the Commonwealth Court's opinion, and its alleged discriminatory standard of review, is what Plaintiff claims violated her equal protection rights. That ruling is also the source of Plaintiff's claims for race and sex discrimination under Title VI as she did not raise these allegations prior to the issuance of the Commonwealth Court's opinion.[10]

Plaintiff also advances three § 1983 claims—one against all Defendants (Count I), one against DHS under a failure to train or supervise theory of liability (Count IV), and one against OCDL, also under a failure to train or supervise theory of liability (Count V). (Compl. ¶¶ 96–98, 107–118.) "In limited circumstances, a local [agency's] decision not to train certain employees about their legal duty to avoid violating citizens' [constitutional or federal] rights may rise to the

---

[10] With respect to Plaintiff's argument that Defendants are now able to hold her to a different standard than the plaintiff in <u>Gibbs</u>, DHS also chose not to renew the plaintiff's registration certificate in <u>Gibbs</u>, despite the fact that she was Caucasian and operated a day care facility in a rural part of the state. It was the Commonwealth Court that reversed the decision of the ALJ in <u>Gibbs</u>, and reinstated the registration certificate—not DHS. Thus, to the extent Plaintiff argues in this case that similarly situated day care operators are being treated differently, that alleged unlawful classification is attributable to the Commonwealth Court, and not DHS.

level of an official government policy for purposes of § 1983." Connick v. Thompson, 131 S. Ct.

1350, 1359 (2011). "[C]ulpability for a deprivation of rights is at its most tenuous where a [§

1983] claim turns on a failure to train." Id. at 1359. Section 1983 is not a source of substantive

rights, and it does not provide redress for common law torts. Berg v. Cnty. of Allegheny, 219

F.3d 261, 268 (3d Cir. 2000). A plaintiff must allege a violation of a federal right in order to

establish a § 1983 claim. Id.

Plaintiff's complaint does not explain which federal or constitutional right(s) were

violated under § 1983. Rather, she lists several federal statutes and constitutional amendments

and generally avers that these entitle her to relief.[11] In her briefs, however, Plaintiff argues that

DHS's decision not to renew her certificate constitutes discrimination based on race, an illegal

taking under the Fifth Amendment of the U.S. Constitution, a violation of equal protection, and a

violation of due process. (Pl.'s Br. 11, Doc. No. 2-1; Pl.'s Br. 5, Doc. No. 6.) Therefore, in order

to determine whether the second Great W. Mining & Mineral Co. element is satisfied with

respect to Plaintiff's § 1983 claims, I will examine the source and the timing of each of these

four alleged deprivations.

Title VI was enacted as part of the landmark Civil Rights Act of 1964. Section 601

provides that no person shall, "on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any [federally

funded] program or activity" covered by Title VI. Alexander v. Sandoval, 532 U.S. 275, 278

(2001) (quoting 42 U.S.C. § 2000d). In relying on the Third Circuit's instruction that a court look

to the timing of the alleged injury as a "useful guidepost," it becomes clear that the substance of

Plaintiff's § 1983 claims—insofar as they are based on Title VI—stem from the Commonwealth

---

[11] "Plaintiff seeks relief under Title VI of the Civil Rights Act of 1964; 42 U.S.C. §§ 1981, 1983, 1985(3), 1986, 1988, the First and Fourteenth Amendments to the Constitution [and] other constitutional provisions [and] federal statutes[.]" (Compl. ¶¶ 98, 112, 118.)

Court's opinion (i.e., she was discriminated against because of her race). Indeed, Plaintiff argues that the "Commonwealth Court's interpretation of the law discriminates against minorities and creates two separate classes of daycare centers…. This interpretation is a violation of … Title VI of the Civil Rights Act of 1964." (Pl.'s Br. 5, Doc. No. 2-1.)

Therefore, to the extent Plaintiff alleges Defendants acted under color of state law to discriminate against her and deprive her of her federally protected rights under Title VI, I conclude the second Great W. Mining & Mineral Co. element is satisfied. Similarly, to the extent Plaintiff argues DHS's decision violated her equal protection rights, I also conclude that—when focusing on the timing of the alleged injury (the alleged unlawful classification and discriminatory standard of review)—her § 1983 claims based on this alleged deprivation also satisfy the second element.

Plaintiff also alleges that DHS's non-renewal violated her due process rights, and constituted an unlawful taking under the Fifth Amendment. As these two allegations are not predicated on an injury caused by the Commonwealth Court judgment, and because the timing of these alleged deprivations existed prior to the issuance of the Commonwealth Court's opinion, Plaintiff's § 1983 claims survive Rooker-Feldman's jurisdictional bar because they do not satisfy the second element of the Third Circuit's test in Great W. Mining & Mineral Co. Additionally, Plaintiff's claim for intentional infliction of emotional distress, her conspiracy claim,[12] and her request for injunctive and declaratory relief are not barred by the Rooker-Feldman doctrine

---

[12] Importantly, Plaintiff does not allege a conspiracy involving the judges involved in rendering the Commonwealth Court opinion. Therefore, she does not allege that she was deprived of an impartial forum, which would constitute a federal injury separate and distinct from the Commonwealth Court's decision. See e.g., Goodson v. Maggi, 797 F. Supp. 2d 624, 628 (W.D. Pa. 2011) (Plaintiff alleged a conspiracy involving thirty-seven (37) named defendants, many of whom were judges, courts, court employees, and other public officials); see also Great W. Mining & Mineral Co., 615 F.3d at 172 (noting that the conspiracy allegations against the Pennsylvania judiciary itself would constitute an independent constitutional violation separate from the decision itself, and thus would not be barred under the Rooker-Feldman doctrine).

because they do not directly attack the Commonwealth Court's judgment. <u>See</u> <u>Great W. Mining</u> <u>& Mineral Co.</u>, 615 F.3d at 167 (noting when a federal plaintiff asserts an injury caused by a defendant's actions, and not by the state-court judgment itself, <u>Rooker</u>-<u>Feldman</u> is not a bar to a federal district court's subject matter jurisdiction).[13]

C.  <u>The State-Court Judgment was Rendered Before the Federal Complaint</u>

DHS mailed a letter to Plaintiff on August 25, 2015 informing her that because the Pennsylvania Supreme Court denied her petition for an appeal, the agency's decision was final. Plaintiff was directed to cease all operation of TPA by September 15, 2015. She filed her federal complaint on October 2, 2015. Therefore, the third <u>Great W. Mining & Minteral Co.</u> element is satisfied with respect to all claims because the state-court litigation had concluded prior to Plaintiff's filing of her federal complaint.

D.  <u>Plaintiff Invites this Court to Review and Reject the State-Court Judgment</u>

The fourth requirement is key to any <u>Rooker</u>-<u>Feldman</u> analysis, and targets whether a plaintiff's claims will require appellate review of a state court decision by a federal district court. <u>Great W. Mining & Mineral Co.</u>, 615 F.3d at 169. "Prohibited appellate review 'consists of a review of the proceedings already conducted by the [state] tribunal to determine whether it reached its results in accordance with the law.'" <u>Id.</u> at 169 (quoting <u>Bolden v. City of Topeka,</u> <u>Ks.</u>, 441 F.3d 1129, 1143 (10th Cir. 2006)).

As noted previously, Plaintiff both directly and indirectly attacks the Commonwealth Court's decision throughout her federal complaint. While Plaintiff renews many of her allegations against Defendants, much of her complaint and accompanying briefs are devoted to

---

[13] In <u>Exxon Mobil Corp.</u>, the Supreme Court cautioned that if a federal plaintiff presents some "independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which [she] was a party," then jurisdiction exists and state law determines whether principles of preclusion apply. 544 U.S. at 293.  "Precisely what this [language] means is not clear from [the <u>Exxon</u> <u>Mobil</u> opinion], but it suggests that a plaintiff who seeks in federal court a result opposed to the one [she] achieved in state court does not, for that reason alone, run afoul of <u>Rooker</u>–<u>Feldman</u>." <u>Hoblock</u>, 422 F.3d at 87.

attacking the Commonwealth Court's interpretation of Pennsylvania case law, and its imposition of an alleged discriminatory standard of review. Simply stated, if I granted Plaintiff the relief she requests, I would necessarily be entering a finding that the Commonwealth Court's conclusions were erroneous. Accordingly, the fourth Great W. Mining & Mineral Co. element is satisfied.

Having determined that several of Plaintiff's claims satisfy all four prongs of the test articulated in Great W. Mining & Mineral Co., I conclude that, even when viewed in the light most favorable to her, Plaintiff's claims for sex and race discrimination (Counts II, III, VI, VII, VIII), as well as her claim that her rights were violated under the First, Fifth, and Fourteenth Amendments (Count X) are barred by the Rooker-Feldman doctrine. These claims will be dismissed for lack of jurisdiction. Similarly, the Rooker-Feldman doctrine bars this Court from asserting subject matter jurisdiction over Plaintiff's § 1983 claims based on a violation of equal protection or discrimination.

However, Plaintiff's § 1983 claims based either on a violation of her due process rights, or her allegations that DHS's non-renewal constituted an unlawful taking, survive Rooker-Feldman's jurisdictional bar as they do not constitute a direct attack on the Commonwealth Court's judgment. For the same reasons, Plaintiff's claims for intentional infliction of emotional distress, conspiracy, and injunctive and declaratory relief also survive Rooker-Feldman.

**IV.    LEGAL STANDARD - RES JUDICATA**

Defendants have also argued that Plaintiff's claims are barred under principles of res judicata. Because Rooker-Feldman only concerns a federal district court's jurisdiction, analysis of whether a plaintiff's claims are barred by res judicata is also necessary. See Great W. Mining & Mineral Co., 615 F.3d at 170 ("As a final step, should the Rooker–Feldman doctrine not apply such that the district court has jurisdiction, 'disposition of the federal action, once the state-court

18

adjudication is complete, would be governed by preclusion law.'") (quoting <u>Exxon</u> <u>Mobil</u>, 544 U.S. at 293). "In other words, the federal court must 'give the same preclusive effect to a state-court judgment as another court of that State would give [because preclusion] is not jurisdictional." <u>Great W. Mining & Mineral Co.</u>, 615 F.3d at 170; <u>see</u> <u>also</u> <u>Cycle Chem, Inc.</u>, 465 F. App'x at 109 (noting res judicata applies to federal civil actions brought under § 1983).

 "[R]es judicata is an affirmative defense and not a doctrine which [defeats] subject matter jurisdiction." <u>Rycoline Products, Inc. v. C & W Unlimited</u>, 109 F.3d 883, 886 (3d Cir. 1997). As such, the Third Circuit has stated that a motion to dismiss is more appropriately analyzed under Rule 12(b)(6) than 12(b)(1) when a defendant argues that res judicata bars a district court from hearing a plaintiff's claims. <u>Id.</u> at 886.

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A court must construe the complaint in the light most favorable to the plaintiff. <u>Fleisher v. Standard Ins. Co.</u>, 679 F.3d 116, 120 (3d Cir. 2012). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." <u>Id.</u>  To determine the sufficiency of a complaint under <u>Twombly</u> and <u>Iqbal</u>, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." <u>Burtch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## V.    ANALYSIS - RES JUDICATA

To establish res judicata, a defendant must demonstrate that there has been: (1) a final judgment on the merits in a prior suit; (2) involving the same parties or their privies; and (3) a subsequent suit based on the same cause of action. Elkadrawy v. Vanguard Grp., Inc., 584 F.3d 169, 172–73 (3d Cir. 2009). Moreover, "res judicata bars not only claims that were brought in the previous action, but also claims that could have been brought." Id. at 173. A claim extinguished by res judicata "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction or series of connected transactions, out of which the action arose." Id. at 174 (emphasis omitted).

For the following reasons, with the exception of Count XIII, in which Plaintiff requests injunctive and declaratory relief, I conclude Plaintiff's remaining claims not barred by the Rooker-Feldman doctrine are nonetheless barred by res judicata.

The Commonwealth Court of Pennsylvania maintains original jurisdiction over civil suits filed against the Commonwealth government and its officers acting in their official capacities. 42 Pa. Cons. Stat. Ann. § 761(a)(1). It also possesses ancillary (supplemental) jurisdiction over "any claim or other matter which is related to a claim or other matter otherwise within its exclusive original jurisdiction." § 761(c).

Regarding the first res judicata element, Plaintiff received a final judgment before the Commonwealth Court, which concluded the ALJ's decision was supported by substantial evidence, was free from errors of law, and did not violate Plaintiff's constitutional rights. Aggie, 2014 WL 10298851, at *10. The Commonwealth Court had supplemental jurisdiction to hear Plaintiff's remaining claims regarding the alleged unlawful conduct of DHS or its agents.

§ 761(c). With the exception of her due process arguments, Plaintiff did not raise any other claims, and the Pennsylvania Supreme Court subsequently denied her petition for an appeal.[14]

As to the second res judicata element, the parties involved in this litigation are the same as those involved in the previous state court litigation. To the extent Plaintiff has added individual DHS employees as Defendants in this case, I nonetheless conclude that the second res judicata requirement is met. The factual allegations concerning these individuals mirror those raised by Plaintiff before the Commonwealth Court—i.e., the allegations are based on the same cause of action. See Sheridan v. NGK Metals Corp., 609 F.3d 239, 261 (3d Cir. 2010) (concluding that the "same parties" requirement in a res judicata analysis is met, despite the addition of more defendants in a subsequent lawsuit, when the "essence of the cause of action" in the second lawsuit is not altered by the addition of more defendants).

Third, the claims that survive the Rooker-Feldman doctrine are based on the same cause of action as Plaintiff's previous state-court case—namely, a request to overturn the alleged unlawful non-renewal of her certificate of compliance. See Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs, 726 F.3d 387, 394 (3d Cir. 2013) (stating that the appropriate inquiry for determining whether a subsequent case is based on the same cause of action is whether the two cases share the "essential similarity" of underlying events that give rise to the legal claims).

---

[14] Plaintiff cites to Pondexter v. Allegheny Cnty. Hous. Auth., 329 F. App'x 347, 350 (3d Cir. 2009) in her Response in Opposition to Defendants' Motion to Dismiss in support of the proposition that allegations of fraud are not barred by the Rooker-Feldman doctrine. (Pl.'s Resp. 16, Doc. No. 11.) This is true as allegations of fraud essentially challenge the manner in which a state-court judgment was obtained. However, in Pondexter, the Third Circuit concluded that while the fraud allegations were not barred under Rooker-Feldman, they were nevertheless barred under principles of res judicata. Pondexter, 329 F. App'x at 350. Here, Plaintiff raised her fraudulent misrepresentation allegations pertaining to Defendant Brown during her appeal to the Commonwealth Court. Indeed, much of the Commonwealth Court's opinion concerned these allegations. See Aggie, 2014 WL 10298851, at *4 (noting that Defendant Brown's "hyper-technical" interpretation of certain facts of the case bordered on "disingenuous," but that the omission of Plaintiff's complete operating history did not undermine the process such that reversal was required because the length of time a commercial facility has been in operation is immaterial to whether it complies with state regulations).

Therefore, with the exception of Plaintiff's requests for injunctive and declaratory relief, her remaining claims—those brought pursuant to § 1983 (Counts I, IV, V), intentional infliction of emotional distress (Count IX), and conspiracy (Count XI)—are barred by res judicata.[15]

## VI.   INJUNCTIVE RELIEF

Defendants also argue that Plaintiff's request for injunctive relief should be denied because she has no likelihood of success on the merits. (Defs.' Resp. 8, 11.) The grant of injunctive relief is an "extraordinary remedy" and should only be granted in "limited circumstances." Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988). An injunction or temporary restraining order should only be granted if a plaintiff can demonstrate: (1) she is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendants; and (4) granting the injunction is in the public interest. NutraSweet Co. v. Vit-Mar Enterprises, Inc., 176 F.3d 151, 153 (3d Cir. 1999).

Failure to establish the first requirement renders an injunction or temporary restraining order inappropriate. Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990); see also In re Revel AC, Inc., 802 F.3d 558, 570 (3d Cir. 2015) ("[E]ven if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the stay opponent if a stay is granted, [she] is still required to show, at a minimum, serious questions going to the merits.") (citations omitted).

As detailed above, this Court lacks jurisdiction over Counts II, III, VI, VII, VIII, and X pursuant to the Rooker-Feldman doctrine. Additionally, Counts I, IV, V, IX, and XI are barred by res judicata.  Plaintiff cannot establish a likelihood of success on the merits because all of her

---

[15] As previously discussed, §1983 is not a source of substantive rights. As such, claims brought under § 1983 may only proceed based on an alleged deprivation of some other federal right. Because any alleged deprivation of a federal right is now barred by res judicata, Plaintiff's § 1983 claims must also fail.

other claims are either barred by <u>Rooker-Feldman</u> or res judicata. Therefore, Plaintiff's request for injunctive relief (Count XIII) must also be denied because none of her allegations plausibly give rise to entitlement to injunctive relief. <u>Iqbal</u>, 556 U.S. at 678; <u>Twombly</u>, 550 U.S. at 570.

## VII.   DECLARATORY RELIEF

Finally, Plaintiff demands that I declare the actions of Defendants to be in violation of the various federal statutes and constitutional amendments previously discussed. (Compl. ¶ 141.)

A federal district court maintains a duty to decide the appropriateness and merits of a declaratory request irrespective of its conclusion as to the propriety of any injunctive relief. <u>Steffel v. Thompson</u>, 415 U.S. 452, 468 (1974). "[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "The Declaratory Judgment Act [§ 2201] was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." <u>Pub. Affairs Associates, Inc. v. Rickover</u>, 369 U.S. 111, 112 (1962); <u>see</u> <u>also</u> <u>Ridge v. Campbell</u>, 984 F. Supp. 2d 364, 373 (M.D. Pa. 2013) (noting that whether declaratory relief should be granted is committed to the sound discretion of the district court).

The Supreme Court of the United States has further instructed that "where another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court, a district court might be indulging in 'gratuitous interference,' if it permitted the federal declaratory action to proceed." <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 283 (1995) (citing <u>Brillhart v. Excess Ins. Co. of Am.</u>, 316 U.S. 491, 495 (1942)).

Although the state litigation in this case is no longer pending, but rather has concluded, I nonetheless find that the policy considerations disfavoring federal intervention are present. In the

same way that <u>Rooker</u>-<u>Feldman</u> seeks to prevent federal review of state-court decisions that are the functional equivalent of an appeal, so too would a grant of declaratory relief in this case constitute a "gratuitous interference" with the already-decided state litigation. <u>Wilton</u>, 515 U.S. at 283. Accordingly, I will deny Plaintiff's request for declaratory relief (Count XIII).

## VIII.   CONCLUSION

The <u>Rooker</u>-<u>Feldman</u> doctrine bars this Court from presiding over Counts II, III, VI, VII, VIII, and X. Res judicata prevents this Court from hearing Counts I, IV, V, IX, and XI. Finally, Plaintiff's requests for injunctive and declaratory relief (Count XIII) must also be denied. Therefore, I will grant Defendants' motion to dismiss, and will deny Plaintiff's TRO motion.[16]

An appropriate order follows.

---

[16] If a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be futile. <u>Alston v. Parker,</u> 363 F.3d 229, 235 (3d Cir. 2004). I conclude that amendment in this case would be futile as Plaintiff cannot cure the jurisdictional defects or circumvent res judicata.